IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TASHA DANTZLER-HOGGARD et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 12-0536 |
| | : | |
| GRAYSTONE ACADEMY CHARTER SCHOOL and GRAYSTONE BOARD OF TRUSTEES, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

YOHN, J.                                                                                  June 6, 2012

Plaintiffs, Tasha Dantzler-Hoggard, Stacey Sutton-Ames, Deborah Forbes, and Anthony

Gordon, former employees of defendant Graystone Academy Charter School ("Graystone"),

bring this action against Graystone and its board of trustees (the "Board"), alleging racial

discrimination, a racially hostile work environment, and retaliation under 42 U.S.C. § 1981; Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and the Pennsylvania Human

Relations Act (the "PHRA"), 43 Pa. Stat. Ann. §§ 951 *et seq.* Currently before me is defendants'

motion to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) or, in the

alternative, to sever plaintiffs' claims. For the reasons that follow, I will grant in part and deny in

part defendants' motion to dismiss, and I will deny as premature defendants' motion to sever.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Graystone is a public charter school in Coatesville, Pennsylvania, serving students in kindergarten through eighth grade. (Compl. ¶ 9.) According to plaintiffs, although the Coatesville School District is predominantly African-American, the teachers and staff at Graystone are predominantly Caucasian. (*Id.* ¶¶ 10–11.) Plaintiffs, who are all African-American, allege that they were subjected to a "racially divisive and hostile work environment" at Graystone. (*Id.* ¶ 28.) They assert that during the 2008–2009 academic year, the Board hired an African-American chief executive officer (Anthony Gordon, a plaintiff in this action) and an African-American principal (Wendell Yorkman) and that the principal in turn hired several African-American employees. (*Id.* ¶¶ 20, 25.) Plaintiffs allege that this increase in the number of African-American employees, and particularly administrators, "caused the Caucasian staff to display behavior that was discriminatory [and] harassing."[2] (*Id.* ¶ 26.)

### A.     The Plaintiffs

#### 1.     Stacey Sutton-Ames

Shortly after Yorkman was hired as the principal of Graystone in September 2008, the Board created, at Yorkman's request, a new position for a dean of students, and on February 23, 2009, Yorkman hired, with the Board's approval, plaintiff Stacey Sutton-Ames to fill that

---

[1] The following summary is based on the allegations in plaintiffs' complaint, which I assume to be true for purposes of defendants' motion to dismiss. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

[2] On May 15, 2009, Yorkman, who is not a plaintiff in this action, filed a complaint with the Pennsylvania Human Relations Commission (the "PHRC"), alleging a hostile work environment at Graystone. (Compl. ¶ 45.) Three days later, the same day that it was served with Yorkman's PHRC complaint, the Board notified Yorkman that his employment contract would not be renewed and that his employment would thereby be terminated. (*Id.* ¶ 46.)

position. (*Id.* ¶¶ 24, 29–31.)

Sutton-Ames alleges that she performed her job "in an exemplary manner" and that at some point during the school year, Graystone issued, and she signed, a letter of intent for her to continue working at the school the following (the 2009–2010) academic year. (*Id.* ¶¶ 32–33.)

She also alleges, however, that she began experiencing a "pattern of discriminatory practices, including being shunned by and being treated in a condescending and harassing manner by the Caucasian teachers." (*Id.* ¶ 34.)

In April 2009, Cortina Faust, an African-American teacher's aide at Graystone, told Sutton-Ames, as well as plaintiff Tasha Dantzler-Hoggard, that, during a meeting earlier that day, several Caucasian teachers had made derogatory comments about African-American employees. (*Id.* ¶¶ 37–38.) One of the teachers allegedly said, "'I can't believe that they have the nerve to hire more Blacks. We already have Yorkman and Gordon, now we have to deal with a Black Dean of Students too. They are hiring too many Blacks. We now have too many of them.'" (*Id.* ¶ 38.)

Sutton-Ames and Dantzler-Hoggard, along with Faust, complained to Yorkman about the incident. (*Id.* ¶ 39.) According to plaintiffs, Yorkman attempted to reprimand the teachers, "but his decision was overturned by the Board." (*Id.* ¶ 40.) Yorkman also allegedly complained to the Board about the "insubordinate, demeaning and degrading attitudes of the Caucasian teachers who worked under him," but the Board did not investigate his complaints or take any action against the teachers. (*Id.* ¶¶ 41–42.)

Shortly thereafter, still in April 2009, Sutton-Ames wrote a letter to the Board "complaining of the discriminatory acts of the Caucasian teachers at Graystone directed towards her and Yorkman." (*Id.* ¶ 43.) She wrote, "'Only being here a very short period of time, words

3

cannot express the hostility, discomfort and tension that I feel, due to the racial tension that I feel, due to the racial allegation and inappropriate behavior displayed to the administrative team, especially the Principal by staff.'" (*Id.* ¶ 44.)

Approximately four months later, on August 11, 2009, the Board sent Sutton-Ames a letter stating that her position (dean of students) was being eliminated and that her employment would therefore be terminated. (*Id.* ¶ 47.) Sutton-Ames alleges that the Board terminated her employment in retaliation for her prior complaints of racial discrimination and harassment. (*Id.* ¶ 50.)

On October 22, 2009, Sutton-Ames filed a complaint with the PHRC, which was cross-filed with the Equal Employment Opportunity Commission (the "EEOC"), alleging a hostile work environment. (*Id.* ¶ 51.)

After her employment at Graystone ended, Sutton-Ames began working as a behavioral specialist for Child Guidance Resource Center, an outside agency, and was assigned to work with children at various schools, including Graystone. (*Id.* ¶ 52.) She alleges that she continued to be harassed whenever she visited Graystone to counsel students. (*Id.* ¶ 53.)

### 2.     Tasha Dantzler-Hoggard

Plaintiff Tasha Dantzler-Hoggard was hired as a social worker at Graystone in January 2007. (*Id.* ¶ 61.) She alleges that she was "subjected to ongoing and continuous harassment and derogatory comments by Caucasian employees at Graystone." (*Id.* ¶ 62.)

Dantzler-Hoggard alleges, for example, that in March 2008, she was photographed in a classroom with the assistant principal at the time, Kristen Bishop. (*Id.* ¶ 63.) Upon seeing the photograph, Bishop, who is Caucasian, complained that she looked too pale. (*Id.* ¶ 63.) In

response to Bishop's comments, the photographer, Jennifer Peed, a Caucasian teacher, allegedly said, "'Of course you do, you're standing next to a darkie.'" (*Id.* ¶ 64.) According to Dantzler-Hoggard, Bishop "failed to rebuke or reprimand" Peed for her comments and thus permitted Peed to make "racially insensitive and derogatory comments." (*Id.* ¶ 65.) Dantzler-Hoggard complained to the human-resources department about Peed's derogatory comments, but, according to her, the human-resources department did not conduct an investigation until months after the incident and only after she complained again. (*Id.*)

Dantzler-Hoggard asserts that Peed's comments were "reflective of the racially hostile and insensitive environment" that existed at Graystone during the course of her employment there—an environment that she alleges was "perpetuated and/or condoned by supervisory employees." (*Id.* ¶ 66.)

Sometime in 2008, the principal at the time, Anne Humphrey, allegedly informed Dantzler-Hoggard that her (Humphrey's) grandfather had owned slaves, and she showed Dantzler-Hoggard the slave coins that he had used to purchase slaves. (*Id.* ¶ 67.) Dantzler-Hoggard alleges that she complained about those comments and that she was "harassed and shunned by the Caucasian teachers" after she complained. (*Id.* ¶ 68.) She alleges that on several occasions the word "bitch" was written on the board in her office in retaliation for her complaints of discrimination. (*Id.* ¶ 69.) She further alleges that Caucasian teachers "refused to inform [her] and use her services as the school's Social Worker when they were dealing with students suffering from mental health issues" and that those teachers did not treat the other school counselor, who was Caucasian, in a similar manner. (*Id.* ¶¶ 71–72.)

Dantzler-Hoggard also alleges that, as part of her job responsibilities, she was required to escort representatives of outside agencies when they visited Graystone and that, on February 19,

5

2010, she let into the school Sutton-Ames, who was then working as a behavioral specialist for the Child Guidance Resource Center and had come to Graystone to counsel a student. (*Id.* ¶¶ 74, 76.) According to Dantzler-Hoggard, as she and Sutton-Ames walked through the school "they were met with stares and whispers by the Caucasian teachers." (*Id.* ¶ 74.) Several days later, on February 23, 2010, several teachers allegedly checked the school's log book and saw that Dantzler-Hoggard had signed Sutton-Ames into the school. (*Id.* ¶ 75.) They allegedly sent an e-mail to the entire teaching staff erroneously stating that Sutton-Ames had come to Graystone Academy to visit Dantzler-Hoggard. (*Id.*)

On March 1, 2010, Dantzler-Hoggard complained to the human-resources department that she was "being ignored, isolated and harassed" by teachers who assumed that Sutton-Ames had come to Graystone to visit her. (*Id.* ¶ 77.) The human-resources representative sent an e-mail to the teaching staff stating that the behavior exhibited toward Dantzler-Hoggard would not be tolerated, but the Caucasian teachers allegedly continued to "isolate, ignore and harass" Dantzler-Hoggard. (*Id.* ¶¶ 78–79.) Dantzler-Hoggard alleges, for example, that after that e-mail was sent, Nancy Cooper, a Caucasian teacher at Graystone, started "making vomiting sounds as she passed Dantzler-Hoggard in the hallways of the building in an effort to intimidate, humiliate and embarrass Dantzler-Hoggard." (*Id.* ¶ 80.)

Around the same time, Dantzler-Hoggard was allegedly approached by a student who told her that a fellow classmate was upset and crying during class and had asked to see her but that the teacher, who was Caucasian, had told the student, in violation of Graystone policy, that she could not leave the classroom. (*Id.* ¶ 81.) Dantzler-Hoggard went to the student's classroom and, upon seeing the student crying at her desk, excused her from class and took her to see the assistant principal, Randy Benedict, because Dantzler-Hoggard was concerned that the student

had not been permitted to leave class to see her. (*Id.* ¶ 82.) When Dantzler-Hoggard returned to her office, she allegedly received an angry telephone call from the student's teacher, who said, "'[W]e need to talk about your actions.'" (*Id.*) Dantzler-Hoggard reported the telephone call to Benedict, who told her that he had received "an irate telephone call" from another teacher, Nancy Cooper, "complaining that Dantzler-Hoggard had 'taken a student from the classroom.'" (*Id.* ¶ 83.) Benedict met with Dantzler-Hoggard and the student's teacher, who "admitted that she was only confrontational with Dantzler-Hoggard 'because Cooper had instigated the matter.'" (*Id.* ¶ 84.)

Dantzler-Hoggard also alleges that on April 15, 2010, when she was speaking with an African-American employee of Child Guidance Resource Center outside a classroom, Cooper approached her, pointed a finger in her face, and stated in a loud voice, "'[M]y students are still testing and you are too loud.'" (*Id.* ¶ 85.)

Dantzler-Hoggard alleges that unlike Caucasian employees who received letters from Graystone renewing their employment contracts, she did not receive such a letter and never received any communication from Graystone regarding her employment.[3] (*Id.* ¶ 86.) She claims that Graystone terminated her employment because of her race and in retaliation for her complaints about discrimination. (*Id.* ¶ 88.)

---

[3] The complaint does not allege the date of Dantzler-Hoggard's termination. In their brief, however, plaintiffs state that Graystone failed to renew Dantzler-Hoggard's employment contract at the end of the school year in 2010. (Mem. of Law in Supp. of Pls.' Resp. in Opp'n to Defs.' Mot. ("Pls.' Br.") at 11 n.2; *see also* Mem. of Law in Supp. of Defs.' Mot. to Sever and/or Dismiss ("Defs.' Br.") at 3 (referring to August 2010).)

### 3.   Deborah Forbes

Plaintiff Deborah Forbes was hired as an administrative assistant at Graystone in August 2009. (*Id.* ¶ 95.) She alleges that soon after she began working at Graystone she "witnessed Caucasian teachers and staff being treated more favorably than African-American teachers and staff." (*Id.* ¶ 96.) She also alleges that she "began to experience a pattern of harassment and discriminatory treatment" and was treated differently from her Caucasian counterparts. (*Id.* ¶¶ 97–98.) She claims, for example, that she was treated in a condescending manner by her Caucasian supervisors whereas her Caucasian counterparts were not. (*Id.* ¶ 99.)

Forbes alleges that on several occasions Dana Taylor, a Caucasian receptionist, falsely claimed that she did not know Forbes's whereabouts when she was asked by Forbes's supervisors, in an attempt to harass and embarrass Forbes. (*Id.* ¶ 100.) Forbes complained to Anthony Gordon, the chief executive officer of Graystone, who met with Forbes and Taylor to discuss the matter. (*Id.* ¶ 101.) Although Taylor apologized and agreed to stop the harassing behavior, she allegedly continued to make false statements to Forbes's supervisors about Forbes's whereabouts and work habits. (*Id.*)

During the course of her employment, Forbes was assigned to the position of "board clerk" by the human-resources department. (*Id.* ¶ 102.) Forbes alleges that those who served as a board clerk were typically paid additional compensation for attending monthly board meetings and typing minutes and agendas and other documents required by the Board. (*Id.* ¶ 103.) In particular, she alleges that two Caucasian women who worked as board clerks were paid $250 for each board meeting they attended. (*Id.* ¶ 105.) Forbes, however, was not paid for her services as a board clerk. (*Id.* ¶ 104.) She complained to the human-resources department as well as the Board about this disparate treatment, but neither investigated or took any action regarding her

complaints. (*Id.* ¶ 106.)

In July 2010, Forbes's employment was terminated. (*Id.* ¶ 107.) She was told that she "was being terminated because she was the last employee hired." (*Id.*) Forbes alleges that five other African-American employees were terminated but that no Caucasian employees were terminated that year. (*Id.* ¶ 108.) She claims that Graystone terminated her because of her race and in retaliation for her complaints about discrimination. (*Id.* ¶ 110.)

### 4.     Anthony Gordon

Plaintiff Anthony Gordon was hired as the chief executive officer of Graystone in August 2008. (*Id.* ¶ 117.) He alleges that he "endured a pattern of harassment [and] discriminatory and retaliatory treatment throughout his employment with Graystone." (*Id.* ¶ 119.)

Gordon alleges that, even though he was the chief executive officer of Graystone and was responsible for the business operations of the school, the Board refused to share information with him about the school's operations, funding, and personnel issues. (*Id.* ¶¶ 118, 127.) He claims that on several occasions the chairman of the Board, who was Caucasian, requested and confiscated his personal notes from weekly administrative meetings for no apparent reason. (*Id.* ¶ 120.) He also alleges that the chairman of the Board, as well as another Caucasian Board member, sent him angry and accusatory e-mails on several occasions. (*Id.* ¶ 125.) He further alleges that an attorney for Graystone was always present at his evaluation meetings but that an attorney was not present at evaluation meetings for Caucasian management employees. (*Id.* ¶ 121.)

According to Gordon, he was scheduled to work an hour longer than Caucasian management employees, and he "was required to 'punch a clock' in and out on a daily basis"

whereas "Caucasian management employees at Graystone were not required to clock in and out." (*Id.* ¶¶ 122–123.) He similarly claims that he received only ten vacation days and five personal days whereas Caucasian management employees received twenty vacation days plus eight personal days. (*Id.* ¶ 124.)

Gordon alleges that he "brought several complaints and specific examples of discriminatory conduct to the Board's attention during his tenure as CEO" but that the Board did not investigate any of the complaints. (*Id.* ¶ 126.) Rather, he claims that the Board "often retaliated against the employee making the complaints of discrimination and warned the employees in general and Gordon in particular about cooperating in any investigations concerning discrimination." (*Id.*) More specifically, Gordon alleges that the Board "warned [him] about cooperating with the [Coatesville] School District's investigation of complaints involving race discrimination and financial impropriety that were brought to their attention after Yorkman was terminated." (*Id.*) Similarly, in April 2010, Gordon reported that Dantzler-Hoggard was being harassed by Cooper, but the Board allegedly refused to investigate. (*Id.*) He also claims that he "was consistently excluded from meetings addressing complaints of discrimination." (*Id.* ¶ 128.)

In July 2010, Graystone's attorney informed Gordon that the Board had decided not to renew his contract but did not provide any reason for this decision. (*Id.* ¶ 129.) Gordon alleges that he was terminated in retaliation for his complaints of discrimination at Graystone. (*Id.* ¶ 130.)

He further alleges that he was never compensated for his unused personal and vacation days even though Caucasian management employees who left Graystone before him (either because they were terminated or because they resigned) were all compensated for their unused

personal and vacation days within thirty days of leaving Graystone.[4] (*Id.* ¶ 131–132.)

### B.      Procedural History

Plaintiffs filed this action against Graystone and the Board on February 1, 2012, alleging racial discrimination, a hostile work environment, and retaliation in violation of 42 U.S.C. § 1981, Title VII, and the PHRA.

Defendants have filed a motion to dismiss plaintiffs' complaint or, in the alternative, to sever plaintiffs' claims.

## II.   DISCUSSION

Defendants seek to dismiss the claims against them, arguing that plaintiffs' claims fail because "[e]ach Plaintiff has failed to allege with particularity any conduct motivated by racial discrimination." (Defs.' Br. at 14.) To the extent that I do not dismiss the complaint, defendants request that I sever plaintiffs' claims, arguing that the "factual and documentary disparities between and among" plaintiffs' claims "will create a confusing and difficult record that will inure to [defendants'] detriment." (*Id.* at 6.) I turn first to defendants' motion to dismiss.

---

[4] Gordon also alleges that he was not compensated for at least one week of employment before his termination. (*Id.* ¶ 132.) He claims that Graystone's failure to compensate him for his unused vacation and personal days and for this week of employment violates the Pennsylvania Wage Payment and Collection Law (the "WPCL"), 43 Pa. Stat. Ann. § 260.1 *et seq.* (*id.*), although he does not actually assert a claim under the WPCL in the complaint.

A.        **Motion to Dismiss**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations "that are 'merely consistent with' a defendant's liability," or that permit the court to infer no more than "the mere possibility of misconduct" are not enough. *Id.* at 1949–50 (quoting *Twombly*, 550 U.S. at 557). Rather, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. When a court evaluates a motion to dismiss, "the factual and legal elements of a claim should be separated." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11; *see also Iqbal*, 129 S. Ct. at 1950 (asserting that a court should assume the veracity of well-pleaded factual allegations, but legal conclusions "are not entitled to the assumption of truth"). And the court must draw all reasonable inferences in favor of the plaintiff. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

Here, plaintiffs allege racial discrimination, a hostile work environment, and retaliation in violation of § 1981, Title VII, and the PHRA. To establish a prima facie case of discrimination under these statutes, a plaintiff must prove (1) that he or she belongs to a protected class; (2) that he or she was qualified for the position; (3) that he or she suffered an adverse employment action; and (4) that the adverse action occurred under circumstances that give rise to an inference of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999).[5] A

---

[5] Because the parties have not pointed to any relevant differences among § 1981, Title VII, and the PHRA for purposes of defendants' motion to dismiss, I treat the claims under these

plaintiff may also establish unlawful discrimination by proving that racial harassment created a hostile work environment. *See Weston v. Pennsylvania*, 251 F.3d 420, 425–26 (3d Cir. 2001) (discussing sexual harassment). To establish the existence of a hostile work environment, a plaintiff must prove (1) that he or she suffered intentional discrimination because of his or her race; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected him or her; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) that a basis for employer liability is present. *See Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Finally, to establish a prima facie case of retaliation, a plaintiff must show (1) that he or she engaged in protected activity; (2) that the employer took a materially adverse action against him or her; and (3) that there was a causal connection between his or her participation in the protected activity and the adverse action. *See Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).

In seeking dismissal of plaintiffs' complaint, defendants argue that plaintiffs' claims fail because plaintiffs have not alleged with particularity any conduct motivated by racial discrimination. While defendants seek to dismiss all the claims against them, their arguments address only plaintiffs' discrimination and hostile-work-environment claims, and they have failed

---

statutes collectively. *See Griffin v. Harrisburg Prop. Servs., Inc.*, 421 F. App'x 204, 207 n.3 (3d Cir. 2011) (not precedential) ("The elements of a racially hostile work environment are the same under Title VII and § 1981." (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001), and *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1050 (8th Cir. 2002)); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009) (recognizing that "the substantive elements of a [discrimination] claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII"); *Slagle v. County of Clarion*, 435 F.3d 262, 265 n.5 (3d Cir. 2006) (explaining that "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently").

to offer any reason for dismissing plaintiffs' retaliation claims. I will thus deny defendants'
motion with respect to plaintiffs' retaliation claims. With respect to defendants' motion to
dismiss plaintiffs' discrimination and hostile-work-environment claims, I consider each
plaintiff's claims in turn.

### 1.    Sutton-Ames

Defendants contend that Sutton-Ames's claims fail because "she does not actually allege
any racial discrimination." (Defs.' Br. at 15.) I agree.

As defendants point out, beyond Sutton-Ames's conclusory allegations that she
experienced "a pattern of discriminatory practices, including being shunned by and being treated
in a condescending and harassing manner by the Caucasian teachers" (Compl. ¶ 34) and that even
after her employment at Graystone ended, she "continued to be harassed whenever she visited
Graystone to counsel students" (*id.* ¶ 53), Sutton-Ames has alleged no facts that would support
an inference that she was discriminated against or that she was otherwise subjected to a hostile
work environment. She does not, for instance, provide any examples of the "condescending and
harassing" treatment that she allegedly experienced.

Dantzler-Hoggard does allege that on February 19, 2010, when she let Sutton-Ames into
the school to counsel a student, she and Sutton-Ames "were met with stares and whispers by the
Caucasian teachers" as they walked through the school. (*Id.* ¶ 74.) It is not clear from the
complaint whether this is the post-employment harassment that Sutton-Ames is referring to. But
even assuming that it is, this single incident—there are no facts alleged anywhere in the
complaint that suggest that Sutton-Ames experienced this sort of behavior more than once—is
not sufficient to state a claim for a hostile work environment. To give rise to a hostile-work-

environment claim, discrimination must be "severe or pervasive." *Jensen*, 435 F.3d at 449.[6]

Of course, "incidents involving employees other than the plaintiff are [also] relevant in establishing a generally hostile work environment," *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987); *see also Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 110–112 (3d Cir. 1999); *West v. Phila. Elec. Co.*, 45 F.3d 744, 757 (3d Cir. 1995),[7] and Sutton-Ames does allege that she learned that on one occasion Caucasian teachers made derogatory comments in the presence of an African-American teacher's aide. (Compl. ¶ 38.) But Sutton-Ames does not allege that she was aware of any other specific incidents of harassment involving other employees. Even viewing the allegations in the complaint in the light most favorable to Sutton-Ames, I cannot conclude that she has alleged sufficient facts to support her conclusory assertions that she experienced "a pattern of discriminatory practices."

---

[6] Sutton-Ames cites *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d Cir. 1999), "for the proposition that post-employment actions by an employer can constitute discrimination under Title VII." (Pls.' Br. at 13–14.) But in *Evans* the Third Circuit held that "[p]ost-employment actions by an employer can constitute discrimination (as opposed to retaliation) under Title VII *if they hurt a plaintiff's employment prospects*," 166 F.3d at 157 (emphasis added), and Sutton-Ames has not asserted any facts that would support an inference that the alleged post-employment harassment hurt her employment prospects in any way. Rather, Sutton-Ames's allegations of post-employment harassment sound more like a hostile-work-environment claim. The parties do not address whether Sutton-Ames may bring a hostile-work-environment claim for conduct that occurred when she was counseling students at Graystone in her capacity as a behavioral specialist for an outside agency, *cf. Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179–81 (3d Cir. 2009) (concluding that plaintiff was an independent contractor, not an employee of defendant, and therefore not protected by Title VII or the PHRA, but holding that "an independent contractor may bring a cause of action under section 1981 for discrimination occurring within the scope of the independent contractor relationship"), and I do not address the issue here.

[7] As the Second Circuit has explained, "[j]ust as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citations omitted).

Because Sutton-Ames has failed to allege sufficient facts to state a claim for discrimination or a hostile work environment, I will grant defendants' motion to dismiss these claims. But I will grant plaintiffs leave to amend the complaint to cure the deficiencies in Sutton-Ames's claims.

### 2. Dantzler-Hoggard

Defendants argue that Dantzler-Hoggard "fails to aver any specific facts in support of her claim, and instead attempts to turn a commonplace workplace dispute into a federal claim." (Defs.' Br. at 16.) In challenging the sufficiency of Dantzler-Hoggard's claims, defendants do not distinguish between her discrimination and hostile-work-environment claims and as to both claims argue that she has failed to allege that the conduct at issue was motivated by discriminatory animus. I disagree.

Contrary to defendants' contentions, Dantzler-Hoggard has pleaded sufficient facts to support an inference that the alleged discriminatory and harassing conduct was motivated by racial discrimination. Dantzler-Hoggard cites, for example, two instances in which Graystone staff made allegedly racially insensitive comments to her—on one occasion, the school's principal told Dantzler-Hoggard that her grandfather had owned slaves and showed Dantzler-Hoggard the slave coins that he had purportedly used to purchase slaves (Compl. ¶ 67); on another occasion, Dantzler-Hoggard was called a "darkie" by a Caucasian teacher (*id.* ¶ 64). Dantzler-Hoggard also alleges an instance in which she was told about derogatory comments made by Caucasian teachers in the presence of an African-American teacher's aide. (*Id.* ¶ 37–38.) She alleges that she was treated differently from the school's other social worker, who was Caucasian—in particular, that Caucasian teachers "refused to inform [her] and use her services as

the school's Social Worker." (*Id.* ¶¶ 71–72.) She alleges that a Caucasian teacher made "vomiting sounds" when she passed her in the hallways. (*Id.* ¶ 80.) And she alleges that she was ultimately terminated on the basis of her race (as well as in retaliation for her complaints of discrimination). While any one of these allegations, taken alone, may not be sufficient to support an inference of discrimination, when taken together, and viewed in the light most favorable to Dantzler-Hoggard, they are sufficient to support such an inference at this motion-to-dismiss stage. Accordingly, I will deny defendants' motion to dismiss Dantzler-Hoggard's claims.

### 3. Forbes

Defendants' argument that Forbes "fails to allege any actual racial discrimination" (Defs.' Br. at 18) is similarly unconvincing. While defendants acknowledge that Forbes alleges, among other things, that she was not paid for her services as a board clerk (Compl. ¶ 104), they contend that "Forbes does not allege that . . . [she] was not paid *because of her race*" (Defs.' Br. at 18 (emphasis added)). But defendants overlook the fact that Forbes specifically alleges that two Caucasian women who served as board clerks were paid $250 for each board meeting they attended, even though she was not compensated for her work as a board clerk. Defendants further overlook Forbes's allegations that she was terminated because of her race (as well as in retaliation for her complaints of discrimination) and that five other African-American employees were terminated the same year that she was but no Caucasian employees were terminated that year. (Compl. ¶¶ 107–108, 110.) This comparator evidence is sufficient to support an inference of discrimination.

As to her claim of racial harassment, Forbes alleges that on several occasions a Caucasian receptionist falsely claimed that she did not know Forbes's whereabouts when she was asked by

Forbes's supervisors, in an attempt to harass and embarrass Forbes. (*Id.* ¶ 100.) Defendants do not suggest that this alleged harassment is insufficient to support a hostile-work-environment claim. Rather, defendants argue only that Forbes has not sufficiently alleged that the receptionist "acted out of any discriminatory intent or motive." (Defs.' Br. at 18.) I disagree.

While Forbes's allegations regarding the receptionist's conduct, standing alone, are insufficient to give rise to an inference of discrimination, when I consider her allegations together with the other plaintiffs' allegations of racially derogatory and insensitive comments (*see* Compl. ¶¶ 37–38, 64, 67) and in the light most favorable to Forbes, I must conclude that these allegations are sufficient to support an inference that the receptionist's conduct was motivated by discriminatory animus. *See West*, 45 F.3d at 757 (explaining that "[i]n some instances, evidence of harassment of others will support a finding of discriminatory intent with regard to a later incident"). The fact that the derogatory comments were made by others, and not the receptionist, does not preclude such an inference. *See id.* at 756 ("If an employer knowingly (actually or constructively) permits a hostile work environment to exist, it is of no import that the collection of incidents comprising the claim were committed by a variety of individuals.").[8]

Accordingly, I will deny defendants' motion to dismiss Forbes's claims.

### 4.    Gordon

Finally, defendants contend that Gordon's claims must fail. Defendants do not suggest that the conduct alleged by Gordon is insufficient to give rise to a claim for discrimination or a

---

[8] I do not address whether evidence regarding comments made to other plaintiffs would be admissible if Forbes's claims went to trial. For now I conclude only that these allegations are sufficient to give rise to the inference of discrimination necessary for Forbes's claims to survive a motion to dismiss.

hostile work environment. Rather, defendants argue only that Gordon has failed to allege that the challenged conduct "had any basis in a discriminatory motive." (Defs.' Br. at 19.) I disagree.

Defendants point first to Gordon's allegations regarding his job requirements and assert that Gordon "does not attribute any of these [requirements] to racial discrimination." (*Id.*) But defendants overlook the fact that Gordon specifically alleges that he was treated differently from Caucasian management employees—he alleges, for example, that he was scheduled to work an hour longer than Caucasian management employees (Compl. ¶ 122); that he was required to clock in and out of work whereas Caucasian employees were not required to do so (*id.* ¶ 123); that he received only ten vacation days and five personal days whereas Caucasian management employees received twenty vacation days plus eight personal days (*id.* ¶ 124); and that after he was terminated he was not paid for his unused vacation and personal days whereas Caucasian management employees who left Graystone before him (either because they were terminated or because they resigned) were paid for their unused vacation and personal days (*id.* ¶¶ 131–132). This comparator evidence is sufficient to support an inference of discrimination at this motion-to-dismiss stage.

As to his other allegations of discrimination and a hostile work environment, Gordon alleges that an attorney was always present at his evaluation meetings whereas an attorney was not present at evaluation meetings for Caucasian management employees (*id.* ¶ 121); that on several occasions the chairman of the Board, who was Caucasian, confiscated Gordon's personal notes from weekly administrative meetings for no apparent reason (*id.* ¶ 120); that the chairman of the Board and another Board member who was also Caucasian sent him various angry and accusatory e-mails (*id.* ¶ 125); and that the Board refused to share information with him about the school's operations, funding, and personnel issues (*id.* ¶127). While racial animus is not

19

expressly implicated in these allegations, Gordon's allegations that he was consistently excluded from meetings addressing complaints of discrimination (*id.* ¶ 128), that the Board warned him about cooperating with the Coatesville School District's investigation of complaints involving racial discrimination (*id.* ¶ 126), and that the Board refused to conduct an investigation when he reported that Dantzler-Hoggard was being discriminated against and harassed (*id.*) support an inference that the alleged harassment was motivated by discrimination.

Accordingly, I will deny defendants' motion to dismiss Gordon's claims.

In sum, I will grant defendants' motion to dismiss Sutton-Ames's discrimination and hostile-work-environment claims without prejudice to plaintiffs' right to amend the complaint to cure the deficiencies in her claims, but I will deny defendants' motion to dismiss the claims of the other three plaintiffs as well as Sutton-Ames's retaliation claims.

I turn now to defendants' motion to sever plaintiffs' claims.

## B.      Motion to Sever

Federal Rule of Civil Procedure 21 grants a court discretion to "sever any claim against a party."[9] Fed. R. Civ. P. 21. Although Rule 21 is titled "Misjoinder and Nonjoinder of Parties," the "justification for severance is not confined to misjoinder of parties," *Spencer, White & Prentis Inc. of Conn. v. Pfizer Inc.*, 498 F.2d 358, 361 (2d Cir. 1974), and "Rule 21 may . . . be invoked to sever the claims of parties otherwise permissively joined pursuant to Rule 20(a) for convenience, to avoid prejudice, or to promote the expeditious resolution of the litigation," *Boyer*

---

[9] Rule 21 provides: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21.

*v. Johnson Matthey, Inc.*, No. 02-8382, 2004 U.S. Dist. LEXIS 9802, at *4 n.1 (E.D. Pa. Apr. 16, 2004).

While defendants assert that the "factual and documentary disparities" among plaintiffs' claims "militates against these claims being tried jointly" (Defs.' Br. at 6, 9), defendants do not argue here that the joinder of plaintiffs is improper under Rule 20.[10] Rather, defendants argue that "these disparities will create a confusing and difficult record that will inure to [their] detriment" and that they will be "significantly prejudiced" if the claims are tried jointly. (*Id.* at 6, 7.) Defendants contend that each plaintiff's claims require a fact-sensitive inquiry and that trying plaintiffs' claims together will result in confusion and prejudice because evidence admissible with respect to one plaintiff's claims will likely be irrelevant and inadmissible with respect to the other plaintiffs' claims.

At this early stage of the proceedings, however, it is too soon to determine whether severance is appropriate. Given that discovery has just begun and has not been discussed by the parties in their briefs, it is not clear what evidence plaintiffs will seek to present, let alone whether evidence relevant to one plaintiff would be admissible with respect to another. Moreover, the parties may choose to file motions for summary judgment at the conclusion of discovery, and until such motions are decided, it cannot be determined which claims, if any, will actually go to trial. Defendants do not suggest that the failure to sever plaintiffs' claims before discovery would cause any inconvenience or prejudice. To the contrary, it seems to me that keeping plaintiffs' claims consolidated in a single action for discovery and other pretrial purposes

---

[10] Rule 20 provides that "[p]ersons may join in one action as plaintiffs" if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and if "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1).

would promote the interests of efficiency and judicial economy. Accordingly, I will deny defendants' motion to sever plaintiffs' claims. If, after discovery has been completed, defendants still believe that severance is necessary, they may renew their motion to sever at that time.

## III.     CONCLUSION

For the reasons set forth above, I will grant defendants' motion to dismiss Sutton-Ames's discrimination and hostile-work-environment claims without prejudice to plaintiffs' right to amend the complaint to cure the deficiencies in her claims if they can do so within the confines of Rule 11, but I will deny defendants' motion to dismiss the claims of the other three plaintiffs as well as Sutton-Ames's retaliation claims. I will also deny defendants' motion to sever plaintiffs' claims without prejudice to their right to renew their motion after discovery has been completed.

An appropriate order accompanies this memorandum.